954 A.2d 1118

**Michael Blaine SHATZER, Sr.**

**v.**

**STATE of Maryland.**

**No. 124, Sept. Term, 2007.**

Court of Appeals of Maryland.

Aug. 26, 2008.

Celia Anderson Davis, Assistant Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for appellant.

Kathryn Grill Graeff, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, and Diane E. Keller, Assistant Attorney General, Baltimore), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, IRMA S. RAKER (Retired, specially assigned) and DALE, R. CATHELL (Retired, specially assigned), JJ.

RAKER, J.

We must decide whether the Circuit Court for Washington County erred in failing to suppress statements obtained from a defendant by the police in an interrogation that occurred two years and seven months after the defendant had requested the presence of an attorney during a prior interrogation for the same crime. In particular, we are asked to decide whether the prohibition against initiating further interrogation once a defendant invokes the right to counsel, as set forth in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378

(1981), was interrupted by a break in custody such that the second interrogation did not violate the defendant's constitutional rights. We shall find that no break in custody occurred and that the *Edwards* rule applied.

## I.

In August 2003, Brenda Lohman, a social worker assigned to the Child Advocacy Center in the Criminal Investigation Division of the Hagerstown Police Department, made a referral to the police department regarding a child, Michael Shatzer, Jr. The referral involved allegations that appellant, Michael Blaine Shatzer, Sr., committed sexual child abuse by ordering his three-year old son to perform fellatio on him. On August 7, Detective Shane Blankenship met with Shatzer to interview him about the investigation at the Maryland Correctional Institution—Hagerstown, where Shatzer was incarcerated on an unrelated offense involving sexual child abuse of a different child. Shatzer waived his *Miranda* rights, but after Detective Blankenship explained what he wanted to discuss, Shatzer invoked his *Miranda* rights and refused to talk without the presence of an attorney; the interview was terminated. Detective Blankenship's written report stated that "When I [Blankenship] again attempted to initiate the interview, he [Shatzer] told me that he would not talk about this case without having an attorney present."

The police closed the investigation in 2003. In February 2006, Brenda Lohman filed a new referral when the child, now older, was able to make more specific allegations. Sergeant Kifer of the Hagerstown Police Department opened a new investigation. Kifer assigned Detective Paul Hoover to the new investigation because Detective Blankenship was on leave at the time the case was assigned.[1] Shatzer was still incarcer-

---

1. At trial, Detective Hoover testified that he knew Detective Blankenship and saw him every day. Detective Blankenship testified that he had heard about the new investigation from Detective Hoover but did not recall whether he told Detective Hoover about Shatzer's previous request for an attorney in 2003. Detective Hoover knew about the

ated within the general prison population, and was housed at the Roxbury Institute. Detective Hoover interviewed Shatzer at the Roxbury Institute on March 2, 2006, where Shatzer had been transferred. It is undisputed that Shatzer remained incarcerated in a Maryland Correctional facility during the entire interim period between the first interrogation in 2003 and the interview by Detective Hoover in 2006.

At the March 2, 2006 interview, Shatzer expressed his surprise at the renewed questioning on the matter involving his son because Shatzer thought that the investigation had been closed. Detective Hoover explained that the Hagerstown Police Department had opened a new investigation on the same matter. Detective Hoover advised Shatzer of his *Miranda* rights and Shatzer signed the waiver form, waiving his right to an attorney and his right to remain silent. At no time did Shatzer indicate that he wished to talk with an attorney. Shatzer denied the fellatio allegation but did admit to masturbating in front of his son, from a distance of about three feet away. At the end of the half hour interview, Shatzer agreed to undergo a polygraph examination. On March 7, 2006, Shatzer was again informed of and waived his *Miranda* rights, and Detective Shawn Schultz administered the polygraph examination. Detective Schultz concluded that Shatzer failed the polygraph test. Detective Hoover then joined Detective Schultz in interviewing Shatzer. Shatzer became emotional, started to cry, and said "I didn't force him. I didn't force him." At that time, he requested an attorney and the interview stopped.

One June 16, 2006, the State's Attorney for Washington County filed in the Circuit Court for Washington County a statement of criminal information against Shatzer for the offenses of second degree sexual offense, sexual child abuse, second degree assault, and contributing to conditions rendering a child in need of assistance. Shatzer filed a motion to suppress the two statements taken by police at the March 2

---

prior investigation, but testified that he was not aware that Shatzer had previously requested an attorney.

and March 7, 2006, interrogations on the basis that Shatzer's prior request for counsel in the 2003 interrogation prevented further interrogation without the presence of an attorney, under the protections afforded by *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).[2]

The Circuit Court held an evidentiary hearing and denied Shatzer's motion to suppress the statements, rejecting his claim that the statements were obtained in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. The trial court relied on *Clark v. State*, 140 Md.App. 540, 781 A.2d 913 (2001), *cert. denied*, 368 Md. 527, 796 A.2d 695 (2002), in which the Court of Special Appeals held that a break in custody occurred that vitiated the *Edwards* prohibition on re-interrogation after the invocation of a defendant's right to counsel. The Circuit Court stated as follows:

> "[T]here was a break in custody for *Miranda* purposes because of the length of time that he was incarcerated continuously in the Division of Corrections. And because of that the requirements of *Edwards*, that is, to not question the defendant without having an attorney present once he asserts those rights, did not apply."

Shatzer waived his right to a jury trial and proceeded to trial before the court on a not guilty, agreed statement of facts.[3] The court found Shatzer guilty of sexual child abuse.[4]

---

2. Defense counsel also filed a motion to suppress any in-court identification of the defendant, all evidence obtained from an alleged illegal search and seizure, a motion to sever the joint trial from any co-defendants and any other charges on unrelated crimes, a motion to dismiss the indictment. None of these motions are relevant to the question before us.

3. The factual predicate in the agreed statement of facts included a stipulation as to testimony from Brenda Lohman, the social worker with the Washington County Department of Social Services and a videotaped interview with the child, Michael, and the statements Shatzer made in the two interviews occurring on March 2 and March 7, 2006. The State's Attorney stated in relevant part as follows:

> "[Shatzer] denied that fellatio occurred. He did admit to masturbating in front of his son and he said his son was about three feet away from him but he said his son never touched him. He did agree to a

Shatzer was sentenced to a term of incarceration for fifteen years, consecutive to any outstanding sentence, with all but five years suspended, followed by five years supervised probation.

Shatzer noted a timely appeal to the Court of Special Appeals. We granted certiorari on our own initiative to consider whether, under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, the trial court erred in failing to suppress statements made nearly three years after appellant invoked his right to counsel and without appellant having been provided access to an attorney. *Shatzer v. State,* 403 Md. 304, 941 A.2d 1104 (2008).

## II.

In reviewing a grant or denial of a motion to suppress evidence, we consider only the record from the suppression hearing. *Rush v. State,* 403 Md. 68, 82–83, 939 A.2d 689, 697 (2008). The suppression court's findings of fact and the credibility of testimony are accepted unless clearly erroneous. *Id.* at 83, 939 A.2d at 697. We review the evidence and all inferences therefrom in the light most favorable to the prevailing party. *Id.* We make an independent, constitutional appraisal of the record by reviewing the law and applying it to the facts of the case. *Id.*

## III.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that, in order to

---

second interview with Detective Shultz and Detective Hoover, At that point, he started to cry and said 'I didn't force him. I didn't force him.' "

The court, in finding Shatzer guilty, relied upon the statements made during the second set of interrogations, stating as follows:

"There is ... admission of the defendant as to the act of masturbation. The Court finds that that is exploitation based on the version of events given."

4. The State entered a *nolle prosequi* to the charge of second degree sexual offense and the court dismissed the two remaining misdemeanor charges as barred by the statute of limitations.

comply with the Fifth and Fourteenth Amendments' prohibition against self-incrimination, a defendant has the right to remain silent and the right to an attorney. *Id.* at 479, 86 S.Ct. at 1630. Significant for our purpose today, the Court made clear that if a defendant invokes his or her Fifth Amendment right to counsel, "the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1628. The clarity of the holding in *Miranda* created a bright-line rule for law enforcement agencies and courts. *Id.* at 441–42, 86 S.Ct. at 1610–11. *See also Berkemer v. McCarty,* 468 U.S. 420, 430, 104 S.Ct. 3138, 3145, 82 L.Ed.2d 317 (1984).

*Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), clarified the scope of the protections afforded to a defendant who invokes his Fifth Amendment right to counsel. In *Edwards,* a defendant invoked his right to counsel, was re-interrogated by police the next morning, and at the second interrogation waived his *Miranda* rights. The Supreme Court held as follows:

> "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

*Id.* at 484–85, 101 S.Ct at 1884–85 (footnote omitted). Under *Edwards,* a suspect who expresses a desire to have counsel cannot be subject to further interrogation until counsel has been made available to him or her, unless the accused initiates further communication. The primary purposes of the *Edwards* rule are to ensure that any statement made in subsequent interrogation is not the result of coercive pressures, to prevent police from badgering a defendant, and to conserve

judicial resources by relieving courts from having to make difficult determinations of voluntariness. *See Minnick v. Mississippi,* 498 U.S. 146, 150–51, 111 S.Ct. 486, 489, 112 L.Ed.2d 489 (1990).

The Supreme Court, in *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.E.2d 704 (1988), refused to create an exception to *Edwards* in a case where the police interrogated a suspect regarding an unrelated offense three days after a prior interrogation where the defendant invoked his right to counsel for a different crime. The Court held that it did not matter that the detective attempting the second interrogation was not aware of the prior invocation of right to counsel, and that the onus was on the police to check the file and discover this fact. *Id.* at 687–88, 108 S.Ct. at 2101. The Court described *Edwards* as a bright-line, prophylactic rule, aimed as a corollary to *Miranda. Id.* at 680–82, 108 S.Ct. at 2097–98. The *"per se* aspect of *Miranda,"* which the Court said applied in equal force to the application of the *Edwards* rule, "was based on this Court's perception that the lawyer occupies a critical position in our legal system because of his unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation," making the right to the presence of an attorney "indispensable to the protection of the Fifth Amendment privilege." *Id.* at 682 n. 4, 108 S.Ct. at 2098 n. 4 (quoting *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568–69, 61 L.Ed.2d 197 (1979)).

In *Roberson,* the Court distinguished between invoking the right to remain silent versus invoking the right to counsel, and stated that the protections afforded in the latter instance as follows:

"As a matter of law, the presumption raised by a suspect's request for counsel—that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance—does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation."

*Id.* at 683, 108 S.Ct. at 2099. The Court stated that any further interrogation without counsel would "surely exacerbate whatever compulsion to speak the suspect may be feeling." *Id.* at 686, 108 S.Ct. at 2100. Thus, the attempt of the police to obtain any subsequent waiver is presumed to be "the product of the 'inherently compelling pressures' " unless counsel is provided. *Id.* at 681, 108 S.Ct. at 2097–98.

The Supreme Court refused again to relax the bright-line rule of *Edwards* in *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). In *Minnick,* the defendant invoked his right to counsel, and then had occasion to speak with an attorney two or three times over three days. When police initiated a second interrogation, however, counsel was not present. The Supreme Court held that *Edwards'* prohibition against further interrogation still applied, stating that "[w]hatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Id.* at 153, 111 S.Ct. at 491. Justice Scalia dissented, calling the *Edwards'* prohibition against further interrogation "perpetual" as a result of the court's decision:

" 'Perpetuality' is not too strong a term, since, although the Court rejects one logical moment at which the Edwards presumption might end, it suggests no alternative ... the result would presumably be the same if [the second interrogation] had been three months, or three years, or even three decades. This perpetual irrebuttable presumption will apply, I might add, not merely to interrogations involving the original crime, but to those involving other subjects as well."

*Id.* at 163, 111 S.Ct. at 496.

In May of 1992, the United States Supreme Court granted certiorari to hear arguments in *United States v. Green,* 592 A.2d 985 (D.C.1991), *cert. granted,* 504 U.S. 908, 112 S.Ct. 1935, 118 L.Ed.2d 542 (May 18, 1992). In *Green,* the District of Columbia Court of Appeals affirmed the trial court's sup-

pression of a murder confession obtained by a police interrogation conducted after the defendant had invoked his right to counsel in an unrelated matter. The original arrest involved drug charges and occurred on July 18, 1989. Green invoked his right to counsel and interrogation ceased. Green was remanded to the custody of juvenile authorities and pled guilty to attempted possession with intent to distribute cocaine. He was transported to the Youth Center at the Lorton Reformatory prior to sentencing. On January 4, 1990, Green was charged with murder in an unrelated crime and was brought to the police station the next day for booking. At that time, he waived his Miranda rights and confessed to the murder.

Green filed a motion to suppress the confession, arguing that the second interrogation violated the protections of *Edwards*. The trial court denied the motion to suppress initially, citing the five month lapse of time between the interrogations, the less coercive environment where the defendant was held, the appointment of counsel and opportunity to consult with an attorney in between the two interrogations. The trial court reconsidered and reversed its ruling after the Supreme Court decided *Minnick v. Mississippi*, because *Minnick* made clear that the interim availability of counsel did not provide a break from *Edwards* protections, and that factor was the most significant reason for denying Green's motion to suppress. *Id.* at 986.

The District of Columbia Court of Appeals affirmed the suppression of the statement. In response to the argument that the case could be factually distinguished from Supreme Court precedent, the court noted as follows:

> "[I]f *Edwards, Roberson* and *Minnick* together teach anything, it is the need for great caution in finding distinctions among cases all involving the paradigmatic original request by the accused for counsel.... The Supreme Court having made clear that police-initiated questioning about a separate offense and questioning after opportunity to consult counsel each fails to justify departure from *Edwards*' 'bright-line, prophylactic ... rule,' we are not convinced that in combination the Court would regard these two factors differently."

*Id.* at 988. Regarding the government's argument that the sheer lapse in time between the two interrogations should alleviate the *Edwards* protections, the court noted arguments on both sides of the issue, but held as follows:

> "Ultimately, given its emphasis on the need for a bright-line rule in this area, we think only the Supreme Court can explain whether the *Edwards* rule is time-tethered and whether a five-month interval ... is too long a period to justify a continuing irrebuttable presumption that any police-initiated waiver was invalid. Until the Court provides further guidance, we are persuaded that so long as the defendant remains in custody the fact that the police did not reinitiate interrogation until five months after he invoked his right to counsel cannot be adequate reason, alone or combined with the factors already treated, to justify a departure from *Edwards'* command."

*Id.* at 989–90.[5] The District of Columbia Court of Appeals articulated the problems with allowing *Edwards* protections to expire "based on the sheer length of time" between interrogations. *Id.* at 988. The court said as follows:

> "In *Minnick*, although the relevant interval was only a matter of days, the [United States Supreme] Court emphasized 'the coercive pressures that accompany custody and that may *increase* as custody is prolonged.' " .... Hence there is nothing in the lapse of time itself from which to deduce that [a defendant's] belief in his vulnerability to the pressures of custodial interrogation had diminished as he progressed through the steps of pleading guilty to the ...

---

**5.** In *United States v. Green*, 592 A.2d 985 (D.C.1991), the issue of continuous custody was not before the District of Columbia Court of Appeals, because, as the Court said, "the government concedes on appeal 'that defendant in this case was in continuous custody for purposes of the *Edwards* prophylactic rule.'" *Id.* at 988. The Court also noted that "[s]trictly speaking, we have no occasion to decide whether different considerations would come into play if the defendant, although still in custody, were transferred to the general prison population following imposition of sentence. Appellant remained in custody pending sentence on the drug charge at the time the police approached him about the murder." *Id.* at 990 n. 8.

offense of attempted drug distribution; it is just as likely that his sense of dependence on, and trust in, counsel as the guardian of his interests in dealing with government officials intensified.

.... If five months in custody without evidence of police 'badgering' is held sufficient to dispel *Edwards'* presumption that any new waiver of rights is involuntary, then why not three months or three weeks? At what point in time—and in conjunction with what other circumstances—does it make doctrinal sense to treat the defendant's invocation of his right to counsel as countermanded without any initiating activity on his part?"

*Id.* at 989 (internal citation omitted) (emphasis in original). In addition, the court rejected the government's third argument for relaxing the *Edwards* prohibition, that the defendant's pleading guilty to the first offense " 'reopened the dialogue with the authorities' within the meaning of *Edwards.*" *Id.* at 990. The court reasoned that since the plea was entered with the advice and assistance of counsel, it did not represent the "pivotal break in events that *Edwards* demands before a waiver can be regarded as an initial election by the accused to deal with the authorities on his own." *Id.* at 991.

The United States Supreme Court granted certiorari to consider the arguments in *Green* on May 18, 1992. *United States v. Green,* 504 U.S. 908, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992). The Court heard oral arguments on November 30, 1992, but before the Court issued an opinion, Green died in prison and the Supreme Court dismissed the petition. *United States v. Green,* 507 U.S. 545, 113 S.Ct. 1835, 123 L.Ed.2d 260 (1993). Since the dismissal in *Green,* the Supreme Court has not granted certiorari to consider potential expiration-triggering events of the protections afforded in *Edwards,* nor has it ruled that a break in custody terminates the presumption of *Edwards. See Eugene Shapiro, Thinking the Unthinkable: Recasting the Presumption of Edwards v. Arizona,* 53 Okla. L.Rev. 11 (2000) (noting that "[t]here is a certain quality to *Edwards v. Arizona* and its progeny that discourages predictions about their future development"). "Rather, a fleeting

reference to continuous custody in *dictum* in *McNeil v. Wisconsin* is sometimes cited as an indication of the Court's view of the issue." *Id.* at 22.

In *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the United States Supreme Court found that the defendant invoked his Sixth Amendment, rather than his Fifth Amendment right to counsel, and thus *Miranda* issues were not implicated. While the issue of *Edwards* protections was not central to the disposition of the case, nonetheless Justice Scalia, writing for the majority, described the *Edwards* protection as providing as follows:

> "Once a suspect asserts the right [to counsel], not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him,'—which means, we have most recently held, that counsel must be present. If the police do subsequently initiate an encounter in the absence of counsel *(assuming there has been no break in custody)*, the suspect's statements are presumed involuntary and therefore inadmissible at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards."

*Id.* at 176–77, 111 S.Ct. at 2208 (emphasis added) (citations omitted). Subsequently, many courts have found that a break in custody exception exists to the *Edwards* rule, where the defendant was released from custody in the interim.[6] A few

---

**6.** *See, e.g., United States v. Harris*, 221 F.3d 1048, 1052 (8th Cir.2000) (*Edwards* does not apply where the concern of police badgering "is not present in cases such as this ... where a person is not in continuous custody and the coercive effects of confinement dissolve"); *Kyger v. Carlton*, 146 F.3d 374, 380 (6th Cir.1998) (*"Edwards* does not, however, apply to suspects who, like Kyger, are not in continuous custody"); *United States v. Barlow*, 41 F.3d 935, 945 (5th Cir.1994), *cert. denied*, 514 U.S. 1030, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995); *United States v. Hines*, 963 F.2d 255, 257 (9th Cir.1992); *In re Bonnie H.*, 56 Cal. App.4th 563, 65 Cal.Rptr.2d 513, 526 (1997); *Keys v. State*, 606 So.2d 669, 672 (Fla.Dist.Ct.App.1992); *State v. Alley*, 841 A.2d 803, 809 (Me.2004); *Commonwealth v. Galford*, 413 Mass. 364, 597 N.E.2d, 410, 414 (1992); *Willie v. State*, 585 So.2d 660, 666 (Miss.1991); *State v. Harrison*, 213 S.W.3d 58 (Mo.Ct.App.2006); *State v. Farris*, 125 S.W.3d

jurisdictions have found a break in custody where a defendant, after invoking the right to counsel during interrogation for one offense, was convicted and sentenced for that offense, and subsequently was interrogated for a second, unrelated offense while incarcerated.[7]

In Maryland, this Court addressed whether a defendant's *Edwards* protections were violated after he invoked his right to counsel in *Blake v. State,* 381 Md. 218, 849 A.2d 410 (2004). Blake, a seventeen-year old male, was arrested at 4:30 a.m. in connection with a murder. During interrogation, he invoked his right to counsel. The police officers put Blake, who was dressed in only boxers and a tank top and was without shoes,

365, 371 (Mo.Ct.App.2004); *Commonwealth v. Wyatt,* 455 Pa.Super. 404, 688 A.2d 710, 712–13 (1997).

Many federal and state courts limited the scope of *Edwards* to continuous custody cases prior to the break in custody exception hinted at in *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). The seminal case is *United States v. Skinner,* 667 F.2d 1306, 1309 (9th Cir.1982), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983) (holding *Edwards* did not apply because "[w]hen Skinner left the station that afternoon, he had the opportunity to contact a lawyer or to seek advice from friends and family if he chose to do so"). *See also Dunkins v. Thigpen,* 854 F.2d 394, 397 (11th Cir.1988), *cert. denied,* 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); *McFadden v. Garraghty,* 820 F.2d 654, 661 (4th Cir.1987); *United States ex rel. Espinoza v. Fairman,* 813 F.2d 117, 124 (7th Cir.1987); *United States v. Geittmann,* 733 F.2d 1419, 1425 (10th Cir.1984); *People v. Trujillo,* 773 P.2d 1086, 1091–92 (Colo.1989); *State v. Bymes,* 258 Ga. 813, 375 S.E.2d 41, 41–42 (1989); *State v. Norris,* 244 Kan. 326, 768 P.2d 296, 301–03 (1989); *In re Wells,* 532 So.2d 191, 196 (La.Ct.App.1988); *Brown v. State,* 661 P.2d 1024, 1029–30 (Wyo. 1983).

**7.** *See, e.g., Isaacs v. Head,* 300 F.3d 1232, 1263 (11th Cir.2002) (finding the protections of *Edwards* do not apply "to a defendant in Isaacs' position—one who has already been tried and convicted of the crime for which he was taken into custody and with respect to which he asserted a right to counsel"). *See also United States v. Arrington,* 215 F.3d 855, 856–57 (8th Cir.2000) (stating that "we find no support in *Edwards* or *Roberson* for *Arrington's* contention that the right [to counsel] 'continues *ad infinitum,*' and certainly not where, as here, the accused has entered a guilty plea and has begun serving his sentence" and stating that after pleading guilty and being transferred "from police custody to correctional custody to serve his sentence" he was "no longer 'in custody' as that term has been used in the context of *Edwards* and *Roberson* ").

in a holding cell and returned a half hour later to give Blake a copy of the arrest warrant and statement of charges indicating that the penalty he was facing was "DEATH." [8] One of the officers then said "I bet you want to talk now, huh!" When the police returned to Blake's cell a half an hour later to give Blake some clothing, Blake asked if he could talk to police, and he then waived his *Miranda* rights.

Blake filed a pre-trial motion to suppress the incriminating statements he made to the police. The trial court granted the defendant's motion to suppress the subsequent statements, reasoning that they were taken in violation of *Edwards*. The State noted a timely appeal, and the Court of Special Appeals reversed. This Court granted certiorari and reversed the Court of Special Appeals, holding that where the police actions "amounted to the functional equivalent of interrogation, thereby violating petitioner's rights," the trial court properly suppressed subsequent statements. *Id.* at 222, 849 A.2d at 412. We held that under such circumstances, Blake's question of whether he could talk to the police related to "routine incidents of the custodial relationship" and did not serve to " 'initiate' a conversation in the sense in which that word was used in *Edwards.*" *Id.* at 237, 849 A.2d at 421 (quoting *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983)). Finally, we observed that "[t]here was no break in custody or adequate lapse of time sufficient to vitiate the coercive effect of the impermissive interrogation." *Id.* at 239, 849 A.2d at 422. The United States Supreme Court granted certiorari in April 2005, *Maryland v. Blake,* 544 U.S. 973, 125 S.Ct. 1823, 161 L.Ed.2d 722 (2005), heard oral arguments on November 1, 2005, and then dismissed the petition two weeks later as improvidently granted. *Maryland v. Blake,* 546 U.S. 72, 126 S.Ct. 602, 163 L.Ed.2d 406 (2005).

---

**8.** The statement of charges included an incorrect assertion that the penalty for first degree murder was "DEATH," even though petitioner was not eligible for the death penalty. *See* Md.Code (2002, 2003 Cum.Supp.), § 2–202(b)(2)(1) of the Criminal Law Article.

While no other case has addressed the *Edwards* issue in this Court since *Blake*, the Court of Special Appeals in *Clark v. State*, 140 Md.App. 540, 781 A.2d 913 (2001), *cert. denied*, 368 Md. 527, 796 A.2d 695 (2002), held that a five-year lapse between interrogations, between which the defendant pled guilty and was sentenced for the crime involved in the first interrogation, constituted a break in custody sufficient to serve as an exception to *Edwards*. The court said that the "five plus years appellant spent in prison after invoking his right to counsel constituted a break in custody." *Id.* at 600, 781 A.2d at 948.

## IV.

Appellant argues that *Edwards* is controlling, because it creates a bright-line rule that a suspect who has requested counsel may not be subjected to further interrogation unless counsel has been made available or the suspect himself has initiated further communication. Appellant maintains that these protections must continue to be honored, irrespective of any break in custody or passage of time. He contends that a police officer reopening an investigation is obligated to become familiar with police reports related to prior questioning, and any ignorance as to the suspect's prior request for counsel should not excuse a failure to honor that request. Appellant further argues that, because there had never been a prosecution following the first investigation, the coercive pressures *Miranda* was intended to dispel remained present, and the second interrogation amounted to badgering the appellant in the manner the *Edwards* prophylactic was intended to prevent. Appellant argues that even assuming *arguendo* that some break in custody exception to *Edwards* exists, a break in custody exception should not be recognized in this case, where he was continuously held in custody in between the interrogations.

The State argues that, because the purpose of the *Edwards* protections is to prevent police from badgering a suspect into abandoning his right to counsel, the suspect's *Edwards* protections ought to expire following either a break in custody or a

substantial passage of time sufficient to diminish this concern. In furtherance of its break-in-custody argument, the State advocates a distinction between police custody and correctional custody. The State contends, in other words, that the suspect is no longer in "custody" once he is released back into a prison's general population. Furthermore, the State argues that the passage of more than two and a half years following the appellant's request for counsel vitiates the concern regarding police badgering which is the underlying rationale for *Edwards*.

## V.

### A.

Commentators and courts have been struggling with how to resolve the question of whether the protective rule of *Edwards* has remained fixed or whether the protection announced by *Edwards* ever ends. Finding it unacceptable that a suspect is forever immunized from all police-initiated custodial interrogation, some courts have held that the passage of time, a break in custody or the disposition of the case originally under investigation of the underlying investigation/case terminates the *Edwards* protections.

We address first the contention that a lapse in time may cause the protections of *Edwards* to expire. We are in accord with the reasoning of the District of Columbia Court of Appeals in *Green*, that "only the Supreme Court can explain whether the *Edwards* rule is time-tethered...." *Green*, 592 A.2d at 989. When the United States Supreme Court granted certiorari in *Green*, the topic of a lapse-of-time expiration to *Edwards* was discussed expressly during oral argument. After the Court questioned petitioner's counsel, the Deputy Solicitor General, as to whether his argument was that "there has been a sufficient passage of time to justify going back to him contrary to *Edwards* or that *Edwards* just wears out after 2 or 3 months?", the following questioning by Justice O'Connor took place:

"[THE COURT]: Well, it isn't clear to me what you would say. Suppose he had remained in custody and it had been 3 months and the police hadn't asked him anything and no guilty plea. Now, is that enough?

[COUNSEL FOR PETITIONER]: Yes, it is, and—

[THE COURT]: 2 months?

[COUNSEL FOR PETITIONER]: 2 months is enough and—

[THE COURT]: 1 month?

[COUNSEL FOR PETITIONER]: 1 month is enough.

[THE COURT]: 2 days?

[COUNSEL FOR PETITIONER]: 2 days is probably not enough. Now, it isn't a bright line.

[THE COURT]: It isn't even a line, is it?"

Transcript of Oral Argument at * 15, *United States v. Green,* No. 91–1521, 1992 WL 687878, *18, 1992 U.S. Trans LEXIS 142 (Nov. 30, 1992). The Supreme Court did not, however, unanimously support the reasonableness of *Edwards'* protections extending in perpetuity. The following exchange occurred also between the Court and respondent's counsel:

"[THE COURT]: Well, do you think Edwards has no time limits at all?

[COUNSEL FOR RESPONDENT]: That's correct.

[THE COURT]: None.

[COUNSEL FOR RESPONDENT]: No, and—

[THE COURT]: So, if the defendant is sentenced, let's say, to a life sentence in connection with the drug charge, at no time then would the Government ever be able to go back and ask him if he had waived—give him his Miranda rights and talk to him about the murder."

*Id.* 1992 WL 687878, at *25.

Since *Green,* debate continues over whether the protections of *Edwards* may expire with time. In *United States v. Hall,* 905 F.2d 959 (6th Cir.1990), for example, the United States Court of Appeals for the Sixth Circuit held that *Edwards* and *Roberson* did not invalidate a Fifth Amendment waiver of the

right to counsel when a defendant had asked for and received appointed counsel on an unrelated charge, and a significant amount of time had passed before the second police interrogation on the new charge.[9] Judge Smith, writing for the court, stated that "neither *Edwards* nor *Roberson* can be interpreted within this appeal to grant to Hall such a blanket protection continuing *ad infinitum.*" *Id.* at 963. The concurring opinions, however, followed different reasoning. Judge Ryan concurred in the judgment, but on the grounds that Hall had invoked only his Sixth Amendment right to counsel. Judge Kennedy concurred also in the judgment, because he believed the admission of the statements at trial was harmless error, but wrote separately because in his view, *Roberson* applied. Judge Kennedy argued that "[t]he fact that he had been in custody for a substantial length of time may or may not have increased the 'pressures of custodial interrogation,'" and that the bright-line rule still applied. *Id.*

The issue of whether the passage of time could terminate the protections of *Edwards* remains an open question. *See, e.g., Eugene Shapiro, Thinking the Unthinkable: Recasting the Presumption of Edwards v. Arizona,* 53 Okla. L.Rev. 11, 25 (2000) ("The passage of time . . . . issue remains open and the Court might well modify the current doctrine. Such a modification would of course require the generalization that, in fact, a protected suspect's need is not a 'perpetual' one. . . . As the duration involved lengthens, debate about the influence of time upon a suspect's helplessness is likely to decrease.")

Nonetheless, allowing *Edwards* to expire poses difficult questions. One scholar who advocates imposing limits on the protections of *Edwards,* recognizes that while allowing Ed-

---

**9.** *United States v. Hall,* 905 F.2d 959 (6th Cir.1990), predated *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). It is not clear whether the court's reliance in *Hall* on the availability and opportunity to consult with appointed counsel prior to the second interrogation is viable after *Minnick. See Minnick,* 498 U.S. at 151–53, 111 S.Ct. at 490–91 (holding that the opportunity to consult with counsel between interrogations was insufficient, and that *Edwards* requires the presence of counsel at the second interrogation).

wards protections to expire with the passage of time may have significant merit, "the passage of time, by itself, should not be enough to eradicate the suspect's *Edwards* rights." *Marcy Strauss, Reinterrogation,* 22 Hastings Const. L.Q. 359, 397 (1995). The author goes on to state as follows:

> "While the need for a bright-line rule should not be over-stated, it seems to have a special poignancy here. How is a court—or a police officer in the first instance—to draw the line and determine how long is long enough? .... To the extent one errs, making the time interval too short, the fear of badgering and coercing confessions in violation of the Fifth Amendment becomes all too real."

*Id.* Although several courts from other jurisdictions suggest that the passage of time could be a factor to cause *Edwards* protections to expire, our research revealed no case that relies *solely* upon the passage of time factor standing alone.[10]

In light of the Supreme Court's ultimate inability to rule on the questions addressed in *Green,* we hold that the

---

**10.** Many courts have used the length of time between interrogations as one relevant factor in considering whether a break in custody exists. *See, e.g., Hill v. Brigano,* 199 F.3d 833, 842 (6th Cir.1999) ("Taking into account both the time lapse between the impermissible interrogation and the incriminating statements by the defendant and the fact that the defendant was aware that he had been assigned counsel, we believe the trial court was correct in analyzing the admissibility of this evidence under the initiation exception to *Edwards"*), *cert. denied,* 529 U.S. 1134, 120 S.Ct. 2015, 146 L.Ed.2d 964 (2000); *Perrine v. State,* 919 So.2d 520, 524–25 (Fla.Dist.Ct.App.2005) (stating that since *"either* a break in custody or a lapse of time may be sufficient to obviate the effect of improper police interrogation," the combination of those two factors served to expire *Edwards* protections). Other courts have suggested in *dicta* that a lapse in time would vitiate *Edwards* protections. *See, e.g., Holman v. Kemna,* 212 F.3d 413, 419 (8th Cir.2000) (stating in *dicta* that "[o]ther circuits have noted that various factors such as a break in custody or a lapse in time may vitiate the coercive effect of an imper-missible interrogation so that the admission of subsequent statements is not barred by the *Edwards* rule. We do not believe these circumstances to be exhaustive and think that other scenarios may also militate against the finding of an *Edwards* violation") (citations omitted); *United States v. Gomez,* 927 F.2d 1530, 1539 n. 8 (11th Cir.1991) (suggesting but not deciding that"[i]t may be possible for enough time to elapse between the impermissible further interrogation and the 'initiation' that the coercive effect of the interrogation will have subsided").

passage of time *alone* is insufficient to expire the protections afforded by *Edwards.* To hold otherwise would create a tenuous slippery slope, whereby the protections against the coercive pressures of interrogation expire after an indeterminate time period has passed. As the District of Columbia court aptly noted in *Green:* "If five months . . . is held sufficient to dispel *Edwards'* presumption that any new waiver of rights is involuntary, then why not three months or three weeks?" *Green,* 592 A.2d at 989. We think that the fact-based analysis such a rule would require would run contrary to the bright-line rule established in *Edwards* and the purpose of *Edwards.* Allowing a lapse of time, standing alone, as the sole factor that terminates the protection against reinterrogation without counsel, would undermine the established rule, that an accused "is not subject to further interrogation" unless either counsel has been made available or "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1885. Without further guidance from the Supreme Court, we adhere to the bright-line rule that without either of these two exceptions, *Edwards* protections continue. *See also Kochutin v. State,* 813 P.2d 298, 304 (Alaska Ct.App.1991), *vacated on other grounds,* 875 P.2d 778 (Alaska App.1994) ("we find nothing in *Edwards* or in subsequent decisions of the Supreme Court to indicate that *Edwards* should be relaxed by the mere passage of time").

### B.

We next address appellee's contention that we should recognize a break in custody exception to the *Edwards* rule. Recognition of such an exception would cause the protections of the bright-line rule in *Edwards* to expire whenever a break in custody occurs between the original invocation of counsel and the second interrogation. We decline to consider the broad question of whether a break in custody would vitiate the *Edwards* presumption, because even assuming *arguendo* that a break in custody would do so, under the facts of this case, the only event that may support a break in custody was

Shatzer's release back into the general prison population in between the two police interrogations. In our view, a suspect who remains in continuous government custody or incarceration remains in custody for *Edwards* purposes, particularly where, as here, the second interrogation regards the same underlying crime as the first interrogation involved.

Many courts have held that a break in custody may serve to expire the protections afforded by the rule in *Edwards*. *See, e.g., Elizabeth Levy, Non–Continuous Custody and the Miranda–Edwards Rule: Break in Custody Severs Safeguards,* 20 New Eng. J. on Crim. & Civ. Confinement 539, 569 (1994) ("The courts have unanimously declined to extend the holding in *Minnick* to non-continuous custody cases"); *Strauss, Reinterrogation,* 22 Hastings Const. L.Q. 359, 386 (1995) ("Virtually every court that has considered this issue has held (or noted in *dicta* ) that a break in custody permits the police to reapproach a suspect who had previously asserted his *Edwards* rights and to try to obtain a waiver"). *See also Kyger v. Carlton,* 146 F.3d 374, 380 (6th Cir.1998) ("We hold that *Edwards* does not, however, apply to suspects who, like Kyger, are not in continuous custody. Although this is an issue of first impression in this circuit, we note that other courts have unanimously reached this conclusion"); *State v. Scanlon,* 719 N.W.2d 674, 682 (Minn.2006) ("[M]any state and federal courts have held that a break in custody defeats the *Edwards* rule"); cases cited at n. 6, *supra.* The United States Court of Appeals for the First Circuit explained the rational behind the break in custody exception in *Kyger v. Carlton* as follows:

> "*Minnick* was in continuous custody, and resisted efforts to make him answer questions. *Id.* at 154, 111 S.Ct. 486. Kyger, by contrast, was not in jail. He was subject to periodic questioning—some custodial and some not custodial, but never under improper pressure—every two or three days. He had ample time during that period to consult with an attorney if he so desired. The concern of *Edwards*— coercive questioning by the government that deprives a suspect of the benefits of the counsel he has requested—

simply is not implicated when a suspect is not in continuous custody."

*Kyger,* 146 F.3d at 381.

Nonetheless, debate continues about the legitimacy and rationale behind recognizing a break in custody exception to *Edwards.* The Court of Special Appeals in *Clark v. State,* 140 Md.App. 540, 586, 781 A.2d 913, 940 (2001) noted that "[s]ince *Minnick,* there has been considerable discussion and disagreement among legal scholars as to whether there are, or at least should be, any exceptions to the seemingly 'bright-line' *Edwards* rule." The United States Supreme Court highlighted concerns about the stage at which a break in custody exception might apply to *Edwards* during the oral arguments in *Green.* The District of Columbia's primary argument in the case was as follows:

> "[T]hat the guilty plea is a dramatic change in circumstances that justifies lifting the [*Edwards* ] presumption. This Court has never had occasion to consider whether the *Edwards* presumption continues in the face of a guilty verdict, let alone a guilty plea. In *Edwards,* in *Roberson,* and in *Minnick,* the subject was in the same position when he invoked his right to counsel as when the police reinitiated questioning, a pretrial suspect. Here, however, in the meantime, the respondent has been found guilty on the matter that led to his arrest and on which he—which triggered his *Miranda* rights in the first place."

Transcript of Oral Argument at *3, *United States v. Green,* No. 91–1521, 1992 WL 687878, *5, 1992 U.S. Trans LEXIS 142 (Nov. 30, 1992). The United States Supreme Court posited "whether the cutoff time might not be the sentencing on the drug charge rather than the entry of the plea." *Id.* 1992 WL 687878, at *10. Thus, the focus of the Supreme Court's concern was whether a guilty plea or conviction on the charge that led to the first interrogation was a relevant intervening event that might cause *Edwards* protections to expire with respect to a second interrogation on an unrelated crime. Notably, the Supreme Court asked, regarding the time be-

tween the two interrogations, "Well, he had been in custody all this time, hadn't he?", to which the counsel for petitioner acknowledged "He had been in custody." *Id.* 1992 WL 687878, at *7.

Despite the debate about the legitimacy of recognizing a break in custody exception to *Edwards*, we need not enter the foray in this case where, as here, Shatzer was held in continuous custody as an incarcerated prisoner during the interim period between interrogations regarding the same subject matter. The basis for the break in custody exception recognized in other courts is typically where a defendant was released from custodial interrogation into society. *See, e.g., Kyger*, 146 F.3d at 380–81 (Kyger was questioned several times within a ten day period but was not "in continuous custody" during that time); *Scanlon*, 719 N.W.2d at 683 (finding there was a break in custody where "there were months between Scanlon's invocation of his right to counsel and his subsequent statements—months in which he was not in custody. By any standard, Scanlon was therefore sufficiently 'out of custody' for his *Edwards* invocation to be nullified").

Of the few courts addressing *Edwards* in continuous incarceration situations, the reasoning behind the break in custody relies in large part on an intervening guilty plea or sentencing, the two possible relevant events identified by the Supreme Court during oral arguments in *Green*, rather than relying solely on a release into general prison population as a sufficient break in custody. The United States Court of Appeals for the Eleventh Circuit in *Isaacs v. Head*, 300 F.3d 1232, 1263 (11th Cir.2002), framed the question as whether *Edwards* protections "do not extend to a defendant in Isaacs' position— one who has already been tried and convicted of the crime for which he was taken into custody and with respect to which he asserted a right to counsel" and, again, "whether *Edwards* protections continue to apply to a prisoner who is in custody following conviction for the crime for which he or she initially asserted the right to deal with the police only through counsel." In holding that a break in custody ended Isaacs' ques-

tion-proof status, the court based its decision in large part on the approach that *"Edwards* does not apply to a defendant *who has been convicted* and who remains in custody only in the sense that he is incarcerated as part of the general prison population." *Id.* at 1266 (emphasis added). Thus, the court considered it relevant that the prior interrogation involving the invocation of counsel occurred prior to conviction. Similarly, the United States Court of Appeals for the Eighth Circuit in *United States v. Arrington,* 215 F.3d 855, 856 (8th Cir.2000), held that *Edwards* protections do not continue indefinitely, and "certainly not where, as here, the accused has entered a guilty plea and has begun serving his sentence."

*Isaacs* and *Arrington* are factually distinguishable from the case at bar in that they involve the invocation of the right to counsel on the original charge, followed by a conviction and sentencing on that charge, and then subsequent interrogation on a new crime while incarcerated on the first charge. The Court of Special Appeals found these distinctions relevant in *Clark,* where the court noted both the length of time that had passed and "the fact that, after counsel was requested, [Clark] pled guilty to the ... murder...." *Clark,* 140 Md.App. at 598–99, 781 A.2d at 947. The court framed the inquiry in *Clark* as follows:

> "Inasmuch as there is a universally recognized 'break-in-custody' exception to *Edwards,* the question becomes whether there has been a 'break in custody' when a suspect invokes his right to counsel, but later pleads guilty, is sentenced, and is serving that sentence in prison prior to reinterrogation by the police."

*Id.* at 589–90, 781 A.2d at 942. By contrast, in the case *sub judice,* Shatzer's two interrogations were separated *solely* by time; they involved the same underlying investigation and he did not enter a plea nor was he sentenced in the interim.

Nevertheless, the *Isaacs* and *Arrington* courts both viewed incarceration within general prison population insufficient to serve as custody for the purposes of the *Edwards* rule. The Eleventh Circuit in *Isaacs* found that "incarceration in prison

is not necessarily the same as *'Miranda* custody,'" and maintained that incarceration "is the accustomed milieu for many inmates, rather than the type of coercive situation that was the source of concern in *Miranda* and its progeny." *Isaacs*, 300 F.3d at 1267. In *Arrington*, the defendant was transferred "from police custody to correctional custody to serve his sentence" and thus the court found that he was "no longer 'in custody' as that term has been used in the context of *Edwards* and *Roberson.*" *Arrington*, 215 F.3d at 856.

While *Arrington* and *Isaacs* are in keeping with the majority view that prison does not constitute *per se* custody for *Miranda* purposes without the finding of some additional restraint,[11] several jurisdictions and scholars express a contrary view. *See, e.g., United States v. Redfield*, 402 F.2d 454, 455 (4th Cir.1968) (per curiam) (prohibiting the use of statements at trial that were obtained when a prison warden questioned an inmate without giving proper *Miranda* warnings); *People v. Woodberry*, 265 Cal.App.2d 351, 71 Cal.Rptr. 165, 168 (1968) (finding a confession obtained from an inmate without *Miranda* warnings must be suppressed); *People v. Faulkner*, 90 Mich.App. 520, 282 N.W.2d 377, 379 (1979); *Blyden v. Hogan*, 320 F.Supp. 513, 519 (S.D.N.Y.1970) (granting a preliminary injunction in a class action by inmates in a city jail who were not given *Miranda* warnings before questioning, since "the plaintiffs here are clearly in custody"); *State v. LaRue*, 19 Wash.App. 841, 578 P.2d 66, 69 (1978); *Inmates of Attica Correctional Facility v. Rockefeller*, 404 U.S. 809, 92 S.Ct. 35, 30 L.Ed.2d 40 (1971) (Douglas, J., dissenting); *Lederer, Miranda v. Arizona The Law Today*, 78 Mil.L.Rev. 107, 129 n. 82 (1978); *Smith, The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?*, 25 S.Car.L.Rev. 699, 725–28 (1974). The view that incarceration is *per se* custody originates from a broad

---

11. *See Laurie Magid, Questioning the Question–Proof Inmate,* 58 Ohio St. L.J. 883, 935 & n. 174 (1997) ("[a]fter *Mathis,* numerous state and lower courts expressly held that not all incarceration constitutes *Miranda* custody and that 'incarceration does not *ipso facto* render an interrogation custodial'").

reading of *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), in which the Supreme Court, regarding the questioning of an inmate in incarceration, said as follows:

"The Government also seeks to narrow the scope of the *Miranda* holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody."

*Id.* at 4–5, 88 S.Ct. at 1505. Other jurisdictions do not interpret *Mathis* so broadly, but recognize that "[t]he question whether a suspect incarcerated on an unrelated offense is *de facto* in custody for all *Miranda* purposes has not been directly addressed by the U.S. Supreme Court." *State v. Tibiatowski,* 590 N.W.2d 305, 309 (Minn.1999). The United States Court of Appeals for the Eighth Circuit, in *United States v. Chamberlain,* 163 F.3d 499 (8th Cir.1998), stressed the importance of considering incarceration in the determination of custody, stating as follows:

"The relevant inquiry is whether a reasonable man in the suspect's position would have understood himself to be in custody. That inquiry must include consideration of the fact of incarceration. The Supreme Court has indicated that when the individual being questioned is already in prison, '[q]uestioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that ... will weaken the suspect's will.' *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, [2397,] 110 L.Ed.2d 243 (1990)."

*Id.* at 502 (citation omitted).

This Court has declined to reach the question of whether incarceration is *per se* custody. *See Whitfield v. State,* 287

Md. 124, 411 A.2d 415 (1980). In *Whitfield,* the question was whether a prisoner questioned by correctional officers about the presence of a gun within the jail was subject to custodial interrogation for purposes of *Miranda,* and whether an emergency exception to *Miranda* exists.[12] We noted that "[w]hile a few courts have been willing to interpret *Mathis* in this broad fashion that prison confinement equals custody, we find that it is unnecessary to do so here since under the general test to be utilized in deciding when one is in 'custody,' which we announce today, it is clear that Whitfield was 'deprived of his freedom of action' in the *Miranda* sense at the time of questioning, without regard to the fact that he was otherwise incarcerated when it occurred." *Id.* at 139, 411 A.2d at 424 (citations omitted). Regarding the determination of whether the defendant was in custody, we noted the consideration of the following factors:

> "[T]hose facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a rea-

---

**12.** In *Whitfield v. State,* 287 Md. 124, 133, 411 A.2d 415, 421 (1980) declined to recognize an emergency exception to Miranda, noting that "the United States Supreme Court itself has not placed any per se limitation on where and when *Miranda* safeguards should be applied." The Supreme Court subsequently recognized an emergency exception in *N.Y. v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), implicitly overruling this portion of *Whitfield.*

sonable person, would have felt free to break off the questioning."

*Id.* at 141, 411 A.2d at 425 (citation omitted).

■ The *Whitfield* test for custody related to determining whether custody existed for *Miranda* purposes. The *Edwards* rule, however, comes into effect with the presumption that two custodial interrogations exist, during which the suspect was in custody for interrogation purposes. Any "break in custody" exception to *Edwards*, then, must mean something different than the test for determining custody for purposes of *Miranda* warnings. This Court, in discussing the difficulty of establishing what constitutes custody, has said that custody is "typically associated with formal arrest or incarceration...." *Owens v. State*, 399 Md. 388, 428, 924 A.2d 1072, 1095 (2007). To determine whether continuous incarceration and a suspect's return to general prison population should be recognized as a break in custody that alleviates the need to comply with the *Edwards* rule, the more appropriate view of custody, for *Edwards* purposes, should be a test on the freedom of movement of the individual and whether the suspect had a meaningful opportunity to secure counsel.

In Maryland, we have held that home detention constitutes "custody" for the purposes of the credit statute, Md.Code (1957, 1992 Repl.Vol., 1995 Supp.), Art. 27 § 638C(a), in *Dedo v. State*, 343 Md. 2, 9, 680 A.2d 464, 468 (1996).[13] We said as follows:

> "[T]he restraints placed upon Dedo while in home detention clearly were sufficiently incarcerative to satisfy the custody requirement of Art. 27, § 638C(a).... For any unexcused or unexplained absence from his home during curfew hours, Dedo could have been charged with escape under Art. 27,

---

**13.** In *Deville v. State*, 383 Md. 217, 221, 858 A.2d 484, 486 (2004), we subsequently found that home detention did not meet the requirement of "confinement in a correctional institution," for the purposes of the enhanced penalty statute. *Deville* does not conflict with our decision in *Dedo v. State*, 343 Md. 2, 680 A.2d 464 (1996), as *Dedo* pertains to whether home detention constitutes custody. *See Deville*, 383 Md. at 231, 858 A.2d at 492.

§ 139. Moreover, Dedo was actually committed to the custody of the Warden of WCDC, and, throughout the period of his home detention, Dedo was subject to the control of the Warden and the Home Detention staff; any violation of the home detention would have resulted in his immediate imprisonment. Dedo's movements and activities were electronically monitored through telecommunications video surveillance equipment, and he was required to permit members of the home detention staff into his home at any time of the day to install and/or inspect the monitoring equipment and to ensure his compliance with the rules of his home detention. In addition, he was not permitted to possess or consume alcoholic beverages and was subject to random urinalysis and breath alcohol testing.

"Further, we believe that where an individual is punishable for escape for any unexcused absence from the place of confinement, his confinement is necessarily involuntary."

*Id.* at 12–13, 680 A.2d at 469–70. The determination that home detention constitutes custody when calculating time served is in keeping with our reasoning that "[c]ustody is an elastic concept which, for the purposes of escape, connotes restraint upon a person's freedom.... When a person is free in every sense of the term, he or she is no longer in custody, and hence, cannot be guilty of the crime of escape." *Farris v. State,* 351 Md. 24, 33, 716 A.2d 237, 242 (1998) (ultimately holding that failure to report for weekend service at a detention center did not constitute an escape from custody because "[p]etitioner did not remain in custody during his absence from the detention center", *id.* at 34, 716 A.2d at 240, where he was free from any restriction during the week). Thus we have upheld convictions for escape where a defendant is in custody, in situations involving a defendant who left work detail at a job site without permission, *see Taylor v. State,* 229 Md. 128, 182 A.2d 52 (1962), or where a prisoner escaped from guard supervision at a hospital while receiving medical treatment, *see Best v. Warden,* 235 Md. 633, 201 A.2d 490 (1964).

Under this reasoning, Shatzer's freedom of movement and action was restricted, because presumably he was not free to

simply leave the interrogation room, but had to comply with restrictions on his movement according to the rules and regulations of the correction facility and under the supervision of prison guards. Nothing had changed since Shatzer's first invocation of his right to counsel when he was subject to questioning for a second time on the same matter, and therefore there is no reason to believe that any coercive pressures driving his request for counsel had subsided.[14] The Supreme Court's reasoning in *Roberson* applies, that

> "As a matter of law, the presumption raised by a suspect's request for counsel—that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance—does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation."

*Roberson*, 486 U.S. at 683, 108 S.Ct. at 2099. Instead, any further interrogation without counsel should be presumed to "surely exacerbate whatever compulsion to speak the suspect may be feeling." *Id.* at 686, 108 S.Ct. at 2100. This is particularly true where, in Shatzer's case, both interrogations involved the same underlying crime, for which Shatzer was the only and primary suspect. Without this presumption, we see no incentive to deter police from using release back into general prison population and subsequent re-interrogation of an inmate who had previously requested counsel, rather than honoring the request.

█ Based on our evaluation of the meaning of custody in light of the purpose of *Edwards*, to protect an individual from

---

**14.** Contrary to the dissent's assertion, the scope of our holding is not "boundless," dissenting op. at 644, 954 A.2d at 1153. We hold merely that there was no break in custody to expire *Edwards* protections, based on the continuous incarceration of Shatzer between two interrogations for the same underlying crime, where he previously invoked his right to counsel. We do not purport to examine all situations where a break in custody might occur, *see supra* at 607–08, 954 A.2d 1131. The dissent's hypothetical situations are not the subject of the case *sub judice,* and any accusation that an incarcerated individual who invokes *Edwards* is "question-proof" under today's holding is undercut by a very real and viable alternative—that the police may provide counsel and resume interrogation.

coercive pressures and police badgering, we decline, without further guidance, to recognize a "break in custody" exception to the *Edwards* rule regarding an inmate who is subject to uninterrupted, continuous incarceration between the first invocation of the right to counsel and a second interrogation when the interrogation relates to the same investigation. Crafting the scope of a break in custody exception to *Edwards,* particularly in the case *sub judice* that involves continuous incarceration, without further direction from the United States Supreme Court, risks blurring the bright-line rule created by *Edwards.*

■ Our holding need not be so broad as to find incarceration *per se* custody for all purposes. Rather, we limit the scope to addressing the existence of a potential break in custody that would vitiate the protections of *Edwards.* We find highly pertinent the Alaskan appellate court's explanation in *Carr v. State,* 840 P.2d 1000 (Alaska Ct.App.1992), where the court said as follows:

> "In *Kochutin [v. State,* 813 P.2d 298 (Alaska Ct.App.1991) ] this court considered the rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which prohibits the police from reinitiating contact with a suspect who has invoked the *Miranda* right to silence during a custodial interrogation, as long as that suspect remains in continuous custody. Kochutin was a sentenced prisoner and was interviewed in jail after having previously invoked his *Miranda* right. The state conceded that Kochutin was in *Miranda* custody when he originally invoked his right to silence. In that context, we decided that, once Kochutin had validly invoked the *Miranda* right, his continued incarceration as a sentenced prisoner qualified as continuous custody for *Edwards* purposes. We did not hold that all sentenced prisoners are *ipso facto* in Miranda custody."

*Carr,* 840 P.2d at 1005 n. 4. We adopt a similar limitation on our holding today, and find that continuous incarceration as a sentenced prisoner qualifies as continuous custody for *Edwards* purposes. In the case of an inmate in continuous

incarceration who invokes his right to counsel, the protections of *Edwards* apply until either counsel is made available to him, or he initiates further conversation with the police. We find this particularly necessary where, as in Shatzer's case, the two interrogations pertained to the same underlying crime.

*JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY WASHINGTON COUNTY.*

HARRELL and CATHELL, JJ., Dissent.

Dissenting Opinion by HARRELL, J., which CATHELL, J. joins.

I respectfully dissent. There are at least two independent reasons that strike me as sufficient cause not to apply the bright line rule of *Edwards*[1] to Shatzer's case A break in time of over two years is enough to disengage the blanket rule of *Edwards*. Further, a nonpretextual break in custody here makes inappropriate application of the holding in *Edwards*. Accordingly, Shatzer's 2006 statements should have been admitted.

## I.  A Substantial Break in Time Disengages the Protections of *Edwards*

### A.  The Supreme Court's Hint

The Majority Opinion adopts a reluctant tone because of the lack of direct guidance from the U.S. Supreme Court regarding limitations on the breadth of application of the *Edwards* rule, noting correctly that the "issue of whether the passage of time could terminate the protections of *Edwards* remains an open question." Majority op. at 605, 954 A.2d at 1130. Casting the federal research net a bit wider, however, reveals an analogous line of cases where the Supreme Court indicated

---

1. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

that statements taken after a *Miranda*[2] violation may be admitted after a substantial passage of time and finding the existence of curative measures. I would take the hint and conclude here that a substantial break in time relieves the need for Shatzer to receive the protections of *Edwards*.

In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), two police officers went to the home of a young suspect, Elstad, intent on arresting him in connection with a burglary. While one police officer discussed the arrest with the suspect's mother in another part of the house, the second officer briefly stopped in the living room with Elstad. The latter officer mentioned that he "felt" that Elstad was involved with the burglary. Elstad responded by admitting that he was at the scene of the crime. The police officers took the suspect to the police station, where he waived his *Miranda* rights and signed a confession. The trial judge excluded Elstad's admission, made in his living room, that he was at the scene of the crime, but admitted the confession made after he had received proper *Miranda* warnings. Elstad was convicted of burglary. The Oregon Court of Appeals reversed the conviction, holding that the signed confession also was inadmissible.

The Supreme Court granted certiorari to consider whether "the Self–Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Elstad,* 470 U.S. at 303, 105 S.Ct. at 1290, 84 L.Ed.2d 222. The Court reversed, reinstating Elstad's conviction. The Court noted that "the absence of any coercion or improper tactics undercuts the twin rationales-trustworthiness and deterrence-for a broader rule" mandating exclusion of the subsequent, "tainted" confession. *Elstad,* 470 U.S. at 308, 105 S.Ct. at 1293, 84 L.Ed.2d 222. The Court reasoned:

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293, 84 L.Ed.2d 222.

The Court noted that "the causal connection between any psychological disadvantage created by his admission and his ultimate decision to cooperate is speculative and attenuated at best." *Elstad,* 470 U.S. at 313–314, 105 S.Ct. at 1295–96, 84 L.Ed.2d 222. It explained that a failure to give a proper *Miranda* warning could be "cure[d]" by a later *Miranda* warning:

In these circumstances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an "act of free will."

*Elstad,* 470 U.S. at 310–311, 105 S.Ct. at 1294, 84 L.Ed.2d 222 (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).

The Court concluded:

A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Elstad,* 470 U.S. at 314, 105 S.Ct. at 1296, 84 L.Ed.2d 222. The need to iterate a bright line rule or test was avoided, however:

> Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.

*Elstad,* 470 U.S. at 318, 105 S.Ct. at 1297–98, 84 L.Ed.2d 222.

In *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court addressed the validity of a "two-step" interrogation. Seibert was arrested in connection with the arson of her mobile home and resulting death of a mentally-ill teenager who resided with her family. She was questioned at the police station for 30 to 40 minutes without being given *Miranda* warnings. She made several incriminating statements during that time, including an admission that she knew that the victim "was meant to die in the fire." The police then allowed her a 20 minute break for coffee and cigarettes. Before the questioning resumed, the police officer read her the *Miranda* warnings. Seibert waived her *Miranda* rights. The police then resumed exploration of her pre-warning admissions. She confirmed that the victim "was supposed to die in his sleep."

After being charged with first degree murder, Seibert moved for the suppression of both the pre-warning and post-warning statements. The police officer testified at the suppression hearing that Seibert's "ultimate statement was 'largely a repeat of information ... obtained' prior to the warning." *Seibert,* 542 U.S. at 606, 124 S.Ct. 2601, 2606, 159 L.Ed.2d 643. He further testified that this "two-step" strategy was a police interrogation technique in which he had been trained:

At the suppression hearing, Officer Hanrahan testified that he made a "conscious decision" to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once."

*Seibert*, 542 U.S. at 605–606, 124 S.Ct. 2601, 2606, 159 L.Ed.2d 643.

The trial court excluded the pre-warning statements, but admitted her post-warning statements. Seibert was convicted of murder.

The Supreme Court reversed her conviction. Justice Souter wrote the plurality opinion, in which Justices Stevens, Ginsburg, and Breyer joined. Justice Kennedy wrote a concurrence, as did Justice Breyer. Justice O'Connor dissented, joined by Chief Justice Rehnquist and Justices Scalia and Thomas.

The plurality opinion summarized the questions raised by the "two-step" interrogation procedure:

The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Seibert*, 542 U.S. at 611–612, 124 S.Ct. 2601, 2610, 159 L.Ed.2d 643. The plurality answered its first rhetorical question regarding the "effectiveness" of the warning given in *Seibert:*

Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would

hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.

*Seibert,* 542 U.S. at 613, 124 S.Ct. 2601, 2611, 159 L.Ed.2d 643. The Court implied, however, that the proximity in time of the two interrogations was a factor in determining whether the *Miranda* warnings retained their effectiveness. "[I]t would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Seibert,* 542 U.S. at 614, 124 S.Ct. 2601, 2611, 159 L.Ed.2d 643.

The Court distinguished the "two-step" procedure in *Seibert* from the unwarned admission in *Elstad.* The *Seibert* Court began its analysis of *Elstad* by noting the benign nature of the interrogation in *Elstad:*

This Court noted that the pause in the living room "was not to interrogate the suspect but to notify his mother of the reason for his arrest," and described the incident as having "none of the earmarks of coercion," The Court, indeed, took care to mention that the officer's initial failure to warn was an "oversight" that "may have been the result of confusion as to whether the brief exchange qualified as 'custodial interrogation' or . . . may simply have reflected . . . reluctance to initiate an alarming police procedure before [an officer] had spoken with respondent's mother."

*Seibert,* 542 U.S. at 614, 124 S.Ct. 2601, 2611, 159 L.Ed.2d 643 (citations omitted). Continuing, the *Seibert* Court stated, "[I]t is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Seibert,* 542 U.S. at 615, 124 S.Ct. 2601, 2612, 159 L.Ed.2d 643.

Comparing the two cases, the *Seibert* plurality crafted a list of factors that should be considered in evaluating "two-step" interrogations:

The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.

*Seibert*, 542 U.S. at 615–16, 124 S.Ct. 2601, 2612, 159 L.Ed.2d 643.

Those factors, applied to the facts in *Seibert* required suppression of the post-warning statements.

At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings. The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to

dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk. *Seibert*, 542 U.S. at 616–617, 124 S.Ct. 2601, 2612–13, 159 L.Ed.2d 643 (citations and footnotes omitted).

Justice Breyer, although joining the plurality opinion, authored a concurrence as well. He stated that, "in my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." *Seibert*, 542 U.S. at 617, 124 S.Ct. 2601, 2613, 159 L.Ed.2d 643 (Breyer, J., concurring).

Justice Kennedy's concurrence is particularly important, as he represents the fifth vote for the judgment in *Seibert*.[3] *See, e.g., United States v. Liddy*, 478 F.2d 586, 586, (D.C.Cir.1972) (Leventhal, J., writing separately) ("I begin with the premise

---

**3.** Where the Supreme Court splits in such a 4–1–4 manner, the concurring opinion is often considered pivotal to discerning a rule to be applied from the case if it provides the narrowest legal grounds upon which a majority of Justices agree. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 764 n. 9, 108 S.Ct. 2138, 2148 n. 9, 100 L.Ed.2d 771 (1988) ("When no single rationale commands a majority, 'the holding of the Court may be viewed as that position taken by those

that the *Branzburg[v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)] decision is controlled in the last analysis by the concurring opinion of Justice Powell (408 U.S. at 709, 92 S.Ct. at 2670) as the fifth Justice of the majority."). He began by noting that "[e]vidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." *Seibert,* 542 U.S. at 618–619, 124 S.Ct. 2601, 2614, 159 L.Ed.2d 643 (Kennedy, J., concurring). Justice Kennedy then compared *Elstad* with the facts in *Seibert.*

In my view, *Elstad* was correct in its reasoning and its result. *Elstad* reflects a balanced and pragmatic approach to enforcement of the *Miranda* warning. An officer may not realize that a suspect is in custody and warnings are required. The officer may not plan to question the suspect or may be waiting for a more appropriate time. Skilled investigators often interview suspects multiple times, and good police work may involve referring to prior statements to test their veracity or to refresh recollection. In light of these realities it would be extravagant to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning. *See Elstad,* 470 U.S., at 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 ("It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings ... so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."). That approach would serve "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression of the ... testimony." *Id.,* at 308, 105 S.Ct. 1285, 84 L.Ed.2d 222.

This case presents different considerations. The police used a two-step questioning technique based on a deliberate

---

Members who concurred in the judgment on the narrowest grounds.' " (quoting *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977)).

violation of *Miranda*. The *Miranda* warning was withheld to obscure both the practical and legal significance of the admonition when finally given. As Justice SOUTER points out, the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. The strategy is based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained. This tactic relies on an intentional misrepresentation of the protection that *Miranda* offers and does not serve any legitimate objectives that might otherwise justify its use.

*Seibert*, 542 U.S. at 620–621, 124 S.Ct. 2601, 2615, 159 L.Ed.2d 643 (Kennedy, J., concurring) (omissions in original).

Justice Kennedy, however, disagreed with the plurality's multi-factor test. He noted that he would instead "apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622, 124 S.Ct. 2601, 2616, 159 L.Ed.2d 643 (Kennedy, J., concurring). His test was:

If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn.

*Seibert*, 542 U.S. at 622, 124 S.Ct. 2601, 2616, 159 L.Ed.2d 643 (Kennedy, J., concurring).

Thus, we find in *Seibert* three different tests offered to determine if a statement, after an unwarned admission, is

admissible: the plurality's multi-factor test; Justice Breyer's good faith test; and Justice Kennedy's curative measures test. Under all of them, Shatzer's statements made after the 2006 *Miranda* warnings would be admissible.

### 1. Plurality Test

Applying the factors articulated by the plurality in *Seibert*, it is clear that Shatzer's statements would be admissible. The 2006 interrogations at issue in the present case cannot be viewed as an extension of the 2003 interrogation. The two-year break in time itself is sufficient. In addition, there was a change in interrogators and location. It may not be said that the interrogations here were "systematic, exhaustive, and managed with psychological skill." 542 U.S. at 616, 124 S.Ct. 2601, 2612, 159 L.Ed.2d 643.

The *Seibert* plurality analysis inquires: "Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?" 542 U.S. at 612, 124 S.Ct. 2601, 2610, 159 L.Ed.2d 643. The second question, modified to reflect the facts of this case, should be framed as: "Could the 2006 *Miranda* warnings reasonably convey that Shatzer could choose to consult an attorney before talking even if he had exercised that same right over two years earlier?" I would answer both of these questions in the affirmative. There can be no question that Shatzer was aware that he had a meaningful choice regarding his right to consult with counsel.[4]

### 2. Justice Breyer's Good Faith Test

The actions of the interrogators here meet the definition of good faith. There is no evidence, nor could there be, that the

---

4. The fact that Shatzer previously exercised his right to speak with an attorney provides even further indicia that he was aware he had such a choice. Shatzer witnessed first-hand how the process is designed to work. At the 2003 interrogation, after a few questions, Shatzer indicated he wished to speak with an attorney. The interrogation stopped immediately. No further questions were asked regarding the case for

interrogators conspired to avoid the requirements of *Miranda* by delaying an interrogation 31 months. The officers' actions were taken in the utmost good faith.

### 3. Justice Kennedy's Curative Measures Test

Justice Kennedy would require that, where police officers willfully avoid necessary *Miranda* warnings, subsequent statements must be excluded unless "curative measures are taken." "[A] substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances...." *Seibert,* 542 U.S. at 622, 124 S.Ct. at 2616, 159 L.Ed.2d 643. In Shatzer's case, there was over a two-year break in time and a new *Miranda* warning. The goal of the "curative measures" is "to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* In the present case, the police immediately ceased interrogation upon Shatzer's invocation of his *Miranda* rights. Two years later, they again read him those rights, which he voluntarily waived. A reasonable person in Shatzer's position, and indeed Shatzer himself, would "understand the import and effect of the *Miranda* warning." Thus, under Justice Kennedy's analysis, the narrowest analysis forming the five-vote majority in *Seibert,* Shatzer's post-warning statements would be admissible even if they were obtained as a result of a deliberate "two-step" interrogation.

### B. Distinction between *Seibert* and the Present Case

The obvious distinction between *Seibert* and the present case is that *Seibert* involved "unwarned" statements given

---

over two years. He witnessed the effect of his assertion of his rights. It cannot be maintained that, at the 2006 interrogations, Shatzer was unaware that he possessed a legitimate and meaningful right to consult with an attorney. Further proof of Shatzer's knowledge of his right to an attorney is supplied by his request to stop the interrogation on 7 March 2006. There, he invoked his right to consult an attorney despite his obvious emotional distress.

prior to *Miranda* warnings, warnings deliberately withheld by the police in order to conceal the rights available to the suspect. Shatzer's case does not. Shatzer invoked his *Miranda* rights, and the interrogation immediately was halted. Over two years later, the police gave Shatzer another *Miranda* warning, and he waived his *Miranda* rights. As noted above, under any of the prevailing tests in *Seibert,* especially Justice Kennedy's, Shatzer's later statements would be admissible. Under the Majority Opinion's analysis here, Shatzer's later statements are excluded. This is an unwarranted result.

The *Seibert* tests permit the introduction of statements even where the police mislead deliberately the suspect in order to avoid the protections afforded by *Miranda.* According to the Majority Opinion, by contrast, where the police act in good faith, timely give *Miranda* warnings, and honor a suspect's assertion of *Miranda* rights, a suspect's statements over two years later, even if proceeded by a *Miranda* warning, are inadmissible. The situation in *Seibert* was a far more egregious violation of the spirit and letter of *Miranda* than the technical, good faith oversight by the latter investigator in the present case. Yet, the statements in *Seibert* receive more favorable treatment. Today, the Majority Opinion essentially says to the police officers who conducted the 2006 interrogations, "We are sorry you acted in good faith and honored both the spirit and letter of *Miranda.* Because you did so, the statements are inadmissible. If only you had withheld deliberately the *Miranda* warning, as in *Seibert,* then perhaps those statements would be admissible following a new *Miranda* warning and similar break in time." What type of police conduct is encouraged by treating statements obtained by deceit and concealment of rights more favorably than those statements obtained by honoring a suspect's *Miranda* rights? I take note of the Supreme Court's acceptance of statements preceded by egregious *Miranda* violations in *Seibert* and would hold that a substantial break in time and a second *Miranda* warning disengages the need for *Edwards'* protections where the police have acted in good faith.

## C. Policy Goals of the *Miranda/Edwards*

The Majority Opinion applies the per se *Edwards* rule, refusing to recognize a break in time exception, without apparent consideration of the policy objectives behind the rule and whether they are furthered by strict application here. The Majority Opinion correctly notes that "[t]he primary purposes of the *Edwards* rule are to ensure that any statement made in subsequent interrogation is not the result of coercive pressures, to prevent police from badgering a defendant, and to conserve judicial resources by relieving courts from having to make difficult determinations of voluntariness." Majority op. at 593–94, 954 A.2d at 1123. None of those laudable goals are furthered by the outcome reached in the Majority Opinion.

There is no contention here, nor could there be, that Shatzer's statements were the product of coercion. The police officers conducted the 2006 interrogations within permissible legal bounds. There is no evidence that Shatzer did not understand the nature of the interrogation or his legal rights. In *Elstad*, the Court noted that "the causal connection between any psychological disadvantage created by his admission and his ultimate decision to cooperate is speculative and attenuated at best." *Elstad*, 470 U.S. at 313–314, 105 S.Ct. at 1295–96, 84 L.Ed.2d 222. I can conceive of no plausible argument that Shatzer suffered a "psychological disadvantage" because the police interrogated him a second time two years after he invoked his right to consult counsel.

The present case has nothing to do with police badgering. Detective Hoover, without actual knowledge that Shatzer previously had requested an attorney, interrogated Shatzer over two years after the original request. Two interrogations in two years is not "badgering." *See* Marcy Strauss, Reinterrogation, 22 HASTINGS CONST.L.Q. 359, 396–97 (1995) ("In other words, the fear in *Edwards* that repeated attempts to question the suspect will exacerbate the already significant compulsion to speak is significantly lessened when the police make no effort to question the suspect for a substantial period of

time."). As the Court of Special Appeals noted in *Clark v. State*, 140 Md.App. 540, 598–599, 781 A.2d 913, 947–48 (2001):

> The practical effect of adopting the rule suggested by appellant would produce absurd results. It would create a class of prisoners who are forever question proof-even though law enforcement officers would often have no way of knowing that the prisoner enjoys question-proof status.
>
> *Edwards, Roberson*,[5] and *Minnick*[6] were all cases in which reinterrogation took place within three days of the prisoner's invocations of their right to counsel. The evil sought to be avoided was police badgering. But with a gap of more than five years between police interrogation sessions, it is impossible to say that the Montgomery County police "badgered" Clark into waiving his right to counsel. Application of the *Edwards* rule to cases like the one at hand would not help achieve *Edwards's* goal of preventing police badgering, nor would it accomplish any other discernable public good.
>
> Common sense dictates that, if a rule is devised to prevent badgering a suspect into giving up his right to counsel, and because of an immense time gap, no badgering even arguably occurred, then blind obedience to the rule is not required.

The Majority Opinion notes that one of the benefits of the bright line *Edwards* rule is to "reliev[e] courts from having to make difficult determinations of voluntariness." Majority op. at 593–94, 954 A.2d at 1123. In essence, this is an appeal to *Edwards'* simplicity. Nonetheless "the apparent simplicity of the prophylactic nature of the [*Edwards* ] rules may be misleading. In order to avoid absurd results, the rules may have to incorporate some 'case-specific' considerations." George E. Dix, *Promises, Confessions, and Wayne LaFave's Bright Line*

---

**5.** *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

**6.** *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

*Rule Analysis,* 1993 U. ILL. L.REV. 207, 231 (1993). *See also* Strauss, *supra,* at 361 ("Yet this seemingly clear, bright-line rule has proven remarkably blurry."). The Majority Opinion only adds to the confusion. Although attempting to preserve the simplicity of *Edwards,* the Majority Opinion holds that "in custody" for *Edwards* purposes is different than "in custody" for *Miranda* purposes. *See, infra,* part III.

Furthermore, the mere fact that no exceptions have been recognized yet for a bright line rule cannot justify not approving such an exception where called for by common sense and persuasive jurisprudence. In other words, the desirability of bright line rules "must be secondary to the content of the rules." Strauss, *supra,* at 377. The Majority Opinion inappropriately places the goal of "simplicity" above all other substantive policy objectives.

## II. Break in Custody Disengages *Edwards* Protections

Although the Majority Opinion declines to address it, I would join the almost universal majority of courts and commentators that recognize that *Edwards'* protections are disengaged by a non-pretextual break in custody. *See, e.g., Kochutin v. State,* 875 P.2d 778, 779 (Alaska App.1994) ("The continuous custody requirement has been universally recognized by federal courts of appeal and appears to be a well-established feature of the *Edwards* rule."); Elizabeth Levy, *Non–Continuous Custody and the Miranda–Edwards Rule: Break in Custody Severs Safeguards,* 20 NEW ENG. J. ON CRIM & CIV. CONFINEMENT 539, 569 (1994) ("The courts have unanimously declined to extend the holding in *Minnick* to noncontinuous custody cases."); Strauss, supra, at 386 ("Virtually every court that has considered this issue has held (or noted in *dicta* ) that a break in custody permits the police to reapproach a suspect who had previously asserted his *Edwards* rights and to try to obtain a waiver."). In sum:

> Under existing law, officials can approach an incarcerated suspect who earlier invoked his right to counsel if that inmate's question-proof status ended with a break in custody between the invocation and the later approach for ques-

tioning. Thus, a critical question for law enforcement is whether a continuously incarcerated suspect can experience a break in custody that will leave him available for questioning, notwithstanding his earlier invocation of the right to counsel.

Laurie Magid, *Questioning the Question-proof Inmate: Defining Miranda Custody for Incarcerated Suspects,* 58 OHIO ST. L.J. 883, 932 (1997) (footnotes omitted).

### III. Two Years in a Correction Facility Constitutes a "Break in Custody"

In its analysis of whether a prisoner serving a sentence at a correctional facility can experience a "break in custody," the Majority Opinion, in my view, errs.

First, the Majority Opinion appears to overlook the word "break" in "break in custody." It maintains that Shatzer was "not free simply to leave the interrogation room, but had to comply with restrictions on his movement according to the rules and regulations of the correction facility under the supervision of prison guards." Majority op. at 617–18, 954 A.2d at 1137. The point of reference seems to be the prison interrogation room. This arguably establishes that, at the exact time of the 2006 interrogations, Shatzer was in custody. It does not establish that Shatzer was in custody prior to stepping into the interrogation room. When he was in the interrogation room, in custody, the officers gave Shatzer the *Miranda* warning as required. The Majority Opinion equates Shatzer's status in the interrogation room at the prison as the same as being in the prison generally. This is not the case. Even if Shatzer was "in custody" at the time of the 2006 interrogation, he was not in custody twenty minutes, twenty days, or twenty months before that interrogation. The Majority Opinion simply is incorrect when it states that "[n]othing had changed since Shatzer's first invocation of his right to counsel ...." Majority op. at 617, 954 A.2d at 1137. Something

had changed. Shatzer spent many months outside of *Miranda*, and *Edwards*, custody.

The issue in the present case is not whether Shatzer was in custody while he was being interrogated in 2006. He was. Accordingly, he was given a *Miranda* warning. The issue is whether Shatzer was in custody in his daily life at the correction facility *prior to* the 2006 interrogation. It is the lack of custody prior to the 2006 interrogation that creates the relevant "break" in custody.

Second, the Majority Opinion, curiously, relies upon a state case of statutory interpretation, *Dedo v. State*, 343 Md. 2, 680 A.2d 464 (1996), to define the term "custody" as applied to a federal constitutional right. In the name of preserving a simple "bright line" rule, the Majority Opinion adds substantial complexity to the *Miranda* doctrine. "In custody" no longer means "in custody." Under the Majority Opinion's analysis, custody means one thing under *Miranda*, and yet another thing under *Edwards*. The *Edwards* rule is a remedy designed to protect a suspect from *Miranda* violations. But, according to the Majority Opinion here, "any 'break in custody' exception to *Edwards* . . . must mean something different than the test for determining custody for purposes of *Miranda* warnings." Majority op. at 615, 954 A.2d at 1136. The Majority Opinion, ignoring the close, corollary relationship between "custody" in *Miranda* and *Edwards*, instead, with a bit of creativity, compares the "custody" requirement of the sentencing credit statute at issue in *Dedo*. *See Arizona v. Roberson*, 486 U.S. 675, 680, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704 (1988) (noting that the "rule of the *Edwards* case came as a corollary to *Miranda* [ ] . . ."); Eugene L. Shapiro, *Thinking the Unthinkable: Recasting the Presumption of Edwards v. Arizona*, 53 Okla. L.Rev. 11, 22 (2000) (noting that the "rule of *Edwards*" is derived from the "rule of *Miranda*"). I would hold that the definition of custody employed to determine whether a suspect should have been informed of his rights (*Miranda*) should be the same as the definition applied in cases where the suspect chooses to invoke those rights (*Edwards*).

The Majority Opinion ignores the definitions of "in custody" provided by the progeny of *Edwards'* jurisprudential ancestor,

*Miranda.* The Majority Opinion ignores a closely related federal constitutional rule regarding criminal procedure and instead utilizes an unrelated state statutory rule that concerns substantive criminal sentencing.[7] According to the Majority Opinion, "in custody" for *Edwards* purposes is better defined by a state sentencing statute than an inherently related federal constitutional rule. Majority op. at 616–17, 954 A.2d at 1136. In sum, reliance on *Dedo v. State,* 343 Md. 2, 9, 680 A.2d 464, 468 (1996), and similar cases is inappropriate.[8]

I, accordingly, would use federal constitutional law, including *Miranda* progeny, to determine the meaning of "in custody" for purposes of the *Edwards* rule.

### A. Cases Addressing *Edwards* Custody

There appear to be only a few cases that address whether a suspect is in *Edwards* custody (as distinguished from *Miranda* custody). The Sixth Circuit held that a defendant in a state penitentiary is not "in custody" for purposes of *Edwards:*

Defendant Hall was captured and returned to the Eddyville penitentiary in August of 1988. At his arraignment, an attorney was appointed for the defendant. Hall spoke to his attorney concerning those charges. Three months later, a threatening letter was sent from the penitentiary to the President of the United States. Two Secret Service Agents questioned Hall about his involvement. The District Court held a hearing and specifically found that Hall waived his *Miranda* protection. Hall admits he answered a few questions and may have known something about the letter. Hall remained in jail, but he was there because he was already serving a prior sentence. Hall was no stranger to the state penitentiary. In fact, Hall was not 'in custody" as that term has been used in the context of *Edwards* and *Roberson.*

---

7. For this reason, relying upon state criminal cases defining the crime of "escape" is inappropriate to define concepts associated with federal constitutional rights.

8. In fact, the Majority Opinion, except for its definition of custody, relies largely on federal law. The Majority Opinion turned to a state statutory interpretation case for this point of law only.

> One could readily argue that Hall was more comfortable within the surroundings in which he was interrogated than the two Secret Service agents.

*United States v. Hall,* 905 F.2d 959, 962 (1990). I find the analysis of the Sixth Circuit in *Hall* more persuasive than the analysis of the Court of Appeals of Alaska in *Carr v. State,* 840 P.2d 1000 (Ala.App.1992), the only case cited by the Majority Opinion that distinguishes the definition of custody under *Edwards* from the definition of custody under *Miranda.* Majority op. at 618–19, 954 A.2d at 1138.

Where the Majority Opinion does address federal caselaw regarding a "break in custody" under *Edwards,* its attempts to distinguish the cases are unpersuasive. The Majority Opinion seeks to distinguish *Isaacs v. Head,* 300 F.3d 1232, 1267 (11th Cir.2002), on the ground that the suspect there was subject to a break in custody because he had been convicted of the crime for which he was interrogated previously. Upon closer analysis, however, it is apparent that the nature of prison life compared to the atmosphere in a police interrogation room was integral to the court's decision. *See Isaacs,* 300 F.3d at 1267 ("This approach recognizes that incarceration in the general prison population is the accustomed milieu for many inmates, rather than the type of coercive situation that was the source of concern in *Miranda* and its progeny.").

The Majority Opinion's distinction of *United States v. Arrington,* 215 F.3d 855, 856 (8th Cir.2000), is similarly unpersuasive. The Majority Opinion correctly notes that the conviction and sentencing for the crime for which the suspect was interrogated was an intervening event in *Arrington.* Equally important, however, is the fact that the suspect was transferred from "police custody to correctional custody." *Arrington,* 215 F.3d at 856. "At that point, Arrington was no longer 'in custody' as that term has been used in the context of *Edwards* and *Roberson . . . ." Arrington,* 215 F.3d at 856–57 (internal quotation omitted).

The Majority Opinion's attempt to distinguish the Court of Special Appeals's opinion in *Clark v. State,* 140 Md.App. 540,

781 A.2d 913 (2001), falls short. The Majority Opinion contends that the *Clark* panel found "relevant" the fact that the suspect in that case, in the interval between the two interrogations, pled guilty to the crime for which his was interrogated originally. Turning to what the intermediate appellate court deemed persuasive, however, the real holding becomes clear:

> For the foregoing reasons, as well as those set forth in *Arrington*, the portion of the law review article by Magid, quoted *supra*, and Chief Judge Bryner's dissent in *Kochutin*, we hold that: (1) a break in custody is an exception to the rule set forth in *Edwards*; (2) for *Miranda* purposes, *the five plus years appellant spent in prison after invoking his right to counsel constituted a break in custody*; (3) the trial court did not violate the *Edwards* rule in denying appellant's motion to suppress his September 1998 statement to police.

*Clark*, 140 Md.App. at 599–600, 781 A.2d at 948 (footnote omitted and emphasis added).

### B. Cases Addressing *Miranda* Custody

Applying the *Miranda* analogies, the Majority Opinion acknowledges that today's holding that incarceration constitutes custody *per se* places Maryland in the minority of jurisdictions that have considered the issue under *Miranda*. See Majority op. at 612, 954 A.2d at 1134 (noting the "majority view that prison does not constitute *per se* custody for *Miranda* purposes without the finding of some additional restraint"). The majority, and better reasoned, view is that a prisoner in a correctional facility is not "in custody" for purposes of *Miranda*. *See* Magid, *supra*, at 935–36 ("After *Mathis*,[9] numerous state and lower courts expressly held that not all incarceration constitutes *Miranda* custody and that incarceration does not ipso facto render an interrogation custodial." (internal quotation omitted)). "Eight of the twelve Circuit Courts have

---

**9.** *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

ruled that incarceration does not always constitute custody for *Miranda* purposes." Magid, supra, at 936.

The Fourth Circuit is in agreement:

> We also decline to read *Mathis* as compelling the use of *Miranda* warnings prior to all prisoner interrogations and hold that a prison inmate is not automatically always in "custody" within the meaning of *Miranda*. Conley's view of the *Mathis* decision would seriously disrupt prison administration by requiring, as a prudential measure, formal warnings prior to many of the myriad informal conversations between inmates and prison guards which may touch on past or future criminal activity and which may yield potentially incriminating statements useful at trial. As the Ninth Circuit pointed out, this approach would "torture [*Miranda*] to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Cervantes*, 589 F.2d at 427. Such a result would be directly at odds with established constitutional doctrine that while persons in government-imposed confinement retain various rights secured by the Bill of Rights, they retain them in forms qualified by the exigencies of prison administration and the special governmental interests that result.

*United States v. Conley*, 779 F.2d 970, 972–73 (1985). The Fourth Circuit noted that the better approach is to determine custody by looking "to the circumstances of the interrogation to determine whether the inmate was subjected to more than the usual restraint on a prisoner's liberty to depart." *Conley*, 779 F.2d 970, 973.[10]

*Conley* relied on the Ninth Circuit's opinion in *Cervantes v. Walker*, 589 F.2d 424, 428 (1978):

---

**10.** The Majority Opinion here also relies upon *United States v. Redfield*, 402 F.2d 454, 455 (4th Cir.1968) (per curiam). *Redfield* holds only that the prisoner was in custody when he was at "a prison disciplinary hearing," where, presumably, the prisoner was not free to leave the room. It does not speak to the non-custodial nature of daily prison life. That distinction was clarified by the Fourth Circuit in *Conley*, discussed *infra*.

The concept of "restriction" is significant in the prison setting, for it implies the need for a showing that the officers have in some way acted upon the defendant so as to have "deprived (him) of his freedom of action in any significant way," *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted). In the prison situation, this necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement. Thus, restriction is a relative concept, one not determined exclusively by lack of freedom to leave. Rather, we look to some act which places further limitations on the prisoner.

*Cervantes,* 589 F.2d 424, 428.

The logic behind the differentiation between the police station, where a suspect would be in *Miranda* custody, and daily life in a correctional facility, where a prisoner is not in *Miranda* custody, is that a contrast should be drawn between the acquired familiarity of the confines of the correction facility and the intimidating presence of a police interrogation room.

The principal difference is in the interrogation room. *Miranda's* presumption was designed in part to influence police behavior which was sometimes spontaneous, under a range of circumstances which often included the wish to obtain a quick confession from a recently apprehended suspect. The absolute requirement that *Miranda's* procedures be implemented, coupled with an irrebuttable presumption of compulsion if they were not, was an effective tool in directing police activities. The context of *Edwards* is quite different.

Shapiro, *supra,* at 31.

Further:

When a defendant leaves the station house, such as on bail, and resumes the normal routines of life, the Court has recognized that he no longer requires the protection of the *Edwards* prophylactic rule. Such a defendant is entitled to the usual *Miranda* protections, but not the additional prophylactic protection of being rendered question-proof.

Likewise, the inmate who has assumed his new routine in prison no longer needs the extra protection of *Edwards*. The restraints necessarily imposed by incarceration become familiar matters to inmates and do not create the coercive circumstances in which it must be presumed that one's free will is overborne.

Magid, *supra*, at 947–49.

In his dissent in *Kochutin v. State*, 813 P.2d 298, 309–10 (Alaska App.1991), Chief Judge Bryner made a similar distinction between the police interrogation room and general prison life:

When a person is confined in custody solely as a sentenced prisoner, with no charges pending, the issue of guilt resolved by a final verdict, and the terms and conditions of future confinement clearly defined in a written judgment that is a matter of public record, the anxiety and uncertainty that support *Miranda's* finding of inherent coercion simply cease to exist. When custody is not related to any pending or unresolved matter, it seems to me that there is little cause for concern that a police officer will appear to control the suspect's fate, at least in the absence of a showing that the officer's conduct somehow creates an atmosphere of custody going beyond that to which the suspect is accustomed in his normal setting.

If it is safe to say under existing case law that a sentenced prisoner cannot automatically be deemed to be in continuing *Miranda* custody, then it is equally safe to say that a sentenced prisoner who invokes the right to counsel upon being interrogated under circumstances amounting to *Miranda* custody and is thereafter returned to normal sentenced-prisoner status should not automatically be deemed to be in continuous custody under *Edwards*. Once returned to the ordinary routine of other sentenced prisoners-without any vestige of the inherently coercive circumstances incidental to custodial interrogation-the prisoner should be treated, for *Edwards* purposes, in the same manner as any person who has been arrested, questioned in custody, and released. [Footnote and citations omitted].

## IV.  Policy Implications of Today's Ruling

The ruling today has troubling policy implications.

That a rule may be easily stated, though, does not mean that it clearly guides conduct.  Application of a long-lasting bar on questioning inmates is enormously difficult in practice.  In determining how to proceed during an investigation in which an inmate becomes a suspect, a police officer would have to find out when, if ever, the inmate had invoked his right to counsel with regard to any crime and when, if ever, the inmate had been released from incarceration.  This can be a highly formidable task.  Many incarcerated suspects will have previously been convicted or at least questioned about numerous other crimes.  Many will have been convicted or questioned in far flung parts of the country over the course of many years by law enforcement officials from many different jurisdictions.  It will often be virtually impossible to determine whether a suspect who has been incarcerated for a number of years has ever invoked his right to counsel and whether he has had any periods of non-confinement after the invocation.

Magid, *supra*, at 927–28.

Under the Majority Opinion's holding, all law enforcement officers from every jurisdiction and agency [11] will be held strictly liable for failure to discover that a suspect previously had invoked the Fifth Amendment right to counsel in connection with any outstanding criminal investigation.[12]  Any suspect who invokes such a right is forever unquestionable.

---

**11.**  In *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Supreme Court reversed the murder conviction of suspect who requested an attorney in an interrogation before FBI investigators and was subsequently questioned by local authorities.  Thus, the Majority Opinion's holding today, combined with the facts of *Minnick*, means that a request to speak with an attorney before one law enforcement agency will prohibit another agency from re-opening questioning of that suspect two years later.

**12.**  In *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), the Supreme Court held that once a suspect requests

The scope of the holding in the Majority Opinion is boundless. For example, if an incarcerated suspect commits an assault while in prison, are investigators prohibited from interrogating the suspect regarding the newly committed assault after a new *Miranda* warning? Do they need to review the notes from every previous interrogation of that suspect in every jurisdiction and every previously opened criminal investigation to determine if he has, at any point in his life, invoked the right to counsel in a criminal charge that has not been adjudicated? If police have reason to believe that a suspect was present at a crime scene, and thus could provide vital, eye-witness information, is the suspect still off-limits, even after a proper *Miranda* warning? *See* Shapiro, *supra*, at 18 ("One wonders how *Edwards'* own invocation might be evaluated today were it to arise in the context of assessing a reinterrogation by an oblivious officer from another state, years later, about another matter.")

The Majority Opinion will discourage police from investigating new leads to older crimes if a suspect in those crimes already is incarcerated for other crimes. If the police fail to discover that at some interrogation, years ago and by another law enforcement agency, the suspect invoked his right to have counsel present, any statements, no matter how voluntary, will be excludable. The police would be better off to wait for the suspect's release, thus ensuring a break in custody, and then interrogate the suspect. Of course, depending on the length of sentence that the suspect is serving, this delay guarantees that memories will fade, evidence will be lost, and other witnesses will move away or die. The Majority's Opinion will place another obstacle, largely clerical in nature, in front of investigators who have the already unenviable assignment of investigating dormant or "cold cases."

---

counsel, police are prohibited from initiating a subsequent interrogation regarding a separate criminal investigation. The Majority Opinion's holding, combined with the facts and holding of *Roberson,* extends to almost an unfathomable scope.

For all of these reasons, I would affirm the judgment of the Circuit Court for Washington County.

Judge CATHELL authorizes me to state that he joins this dissent.